BIRGE ET UX. *v.* TOWN OF EASTON ET AL.

[No. 242, September Term, 1974.]

*Decided May 7, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William Gar Richlin* and *Roger D. Redden*, with whom were *Piper & Marbury* on the brief, for appellants.

*L. Clark Ewing* and *H. Michael Hickson* for appellees.

MURPHY, C. J., delivered the opinion of the Court.

This appeal presents the question whether the Town of Easton (the Town) may by charter amendment authorize the acquisition of an interest in real property located beyond its corporate limits in Delaware for use in connection with the operation of its municipally owned electric system. The Circuit Court for Talbot County (Rasin, C. J.) by declaratory decree dated January 10, 1975 concluded that the Town's adoption and enactment of a charter amendment authorizing such acquisition "was a valid exercise of the municipal home rule charter amendment powers possessed by the . . . [Town] under the authority of Article XI-E of the Maryland Constitution and Article 23A of the Maryland Code (1957, 1973 Repl. Vol.)." We granted certiorari prior to decision by the Court of Special Appeals on the appeal taken to that court so that we could promptly consider the significant issues raised in the case. *See* Maryland Code (1974) Courts and Judicial Proceedings Article, § 12-201.

The pertinent facts are these: Chapter 143 of the Acts of 1914 of the General Assembly of Maryland authorized the Town to operate an electric system and to supply light, heat and power "to the citizens of Easton and vicinity." By Chapter 263 of the Acts of 1914, the Legislature created the

Easton Utilities Commission (the Commission) as an agency of the Town and invested it with broad powers to manage and operate "the municipal sewerage system and water works and all or any other revenue producing utilities which are now owned or may be hereafter constructed or acquired by the town [including the power] . . . . to make extensions, additions or improvements to the plants or systems . . . ." These provisions were codified as Article 21, §§ 222 and 243 of the Code of Public Local Laws of Maryland (1930 Edition) and are now included with minor revisions within Article IV of the Charter and Code of Easton (1967).

Pursuant to authority granted by the Public Service Commission of Maryland (PSC), the Town's electric system, which includes generation and distribution facilities, services an area of approximately 50 square miles both within and without the Town limits. The Commission having determined that need existed to obtain a supplemental base load supply of electricity to enable it to service its customers adequately, it entered into negotiations with the Delmarva Power & Light Company (Delmarva), a Delaware corporation engaged in the business of producing and distributing electrical power throughout the Delmarva peninsula. On July 10, 1973, Delmarva offered to extend a minority ownership interest to the Town (as a tenant in common without right of partition) in its proposed Summit Nuclear Power Plant (the Plant) located in New Castle County, Delaware. Under the terms of the proposal, Delmarva would hold the majority ownership interest; other private, municipal, and cooperative utilities located in Maryland, Pennsylvania, and Delaware, would hold minority interests; and Delmarva would operate the Plant pursuant to an "Owners Agreement."

By charter amendment resolution No. 40, which became effective July 7, 1974, the Town amended Article II, § 20 of its charter to provide:

"(b) The town shall have complete power and authority to own or finance any interest in real or

personal property for use as part of or in connection with any municipally owned public utility, within or without its corporate limits or any designated service area, including, but not by way of limitation, an interest in any gas or electric plant."

The charter amendment also specified that the Town could contract with, or acquire property interests in common with, any other privately owned public utility in order to secure entitlement to a portion of the output or production of the jointly or commonly owned facilities for the benefit of the customers of the Town's municipally owned public utilities.

To finance its acquisition of an ownership interest in the Plant, the Town proposed to issue either its general obligation bonds or revenue bonds, the debt service therefor to be payable either from taxes upon real property located in the Town or from service charges imposed upon the Commission's electric customers.

Lawrence and Burnetta Birge (the Birges), residents and property owners of the Town, and customers of the Commission, sought a declaratory decree that the Commission and Town had no legal authority, separately or together, to acquire or to finance the acquisition of any ownership interest in the Plant because:

"A. Neither Article XI-E of the Maryland Constitution nor Article 23A of the Annotated Code of Maryland authorizes or empowers a municipal corporation (1) to purchase real property beyond its boundaries and in another State, or (2) to hold property jointly with a private corporation.

B. The Resolution, amending the Town's Charter, is void and invalid for the reason that a municipal corporation may not amend its Charter to permit that which is not authorized by Article XI-E of the Constitution or Article 23A of the Code.

C. The Resolution, amending the Town's Charter, is void and invalid for the reason that a municipal corporation may not amend its Charter

to authorize acts involving matters of general State concern.

D. The issuance of the Town's general obligation bonds or revenue bonds to finance the acquisition of an interest in the Plant would constitute a waste of the Town's funds for the reason that the acquisition would be *ultra vires.* "

In concluding that the charter amendment was valid, the lower court said that the express grant of power to the Town and Commission to operate an electric system carried with it the implied power to acquire an ownership interest in property located beyond the corporate limits of the Town where such acquisition reasonably facilitated the distribution of electricity in the area served by the Commission.

On appeal, the Birges argue that the Town may not confer upon itself by charter amendment the power to acquire extraterritorial property because such power has not been expressly granted by Article XI-E of the Constitution of Maryland or by the General Assembly and that the charter amendment authorizing the Town to acquire extraterritorial property is void because it infringes upon a matter of general state concern. The Town and the Commission contend that the charter amendment is a local matter within the authority conferred upon municipalities by Article XI-E and by Code, Article 23A; that the express grant of power to the Town to own and to operate, through the Commission, a municipal electric utility implies the power to acquire extraterritorial property; and that a municipal corporation does not need express authority to purchase extraterritorial property.

The Town of Easton, as a municipal corporation, possesses only limited powers. In *McRobie v. Town of Westernport,* 260 Md. 464, 466, 272 A. 2d 655, 656 (1971), we quoted with approval from 1 J. Dillon, *Municipal Corporations* § 237 at 449 (5th ed. 1911), as follows:

" 'a *municipal corporation . . . can exercise the following powers, and no others*: First, those

granted in *express words*; second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those *essential* to the accomplishment of the declared objects and purposes of the corporation, — not simply convenient, but indispensable.' " (Emphasis in the original.)

It has been held that general power vested in a municipality to own and operate a utility includes the power to serve consumers without, as well as within, its corporate limits. *Bair v. City of Westminster*, 243 Md. 494, 498, 221 A. 2d 643, 645 (1966). Because a municipality which operates a utility acts in a business or proprietary, rather than a governmental capacity, and on the same plane as any private corporation engaged in the same business, it is under a duty to furnish to all persons applying therefor the service which it offers without discrimination and at reasonable rates, where the service requested is within the reasonable range of its plant and equipment. *Crisfield v. Public Service Comm.*, 183 Md. 179, 36 A. 2d 705 (1944); *Loan Corporation v. Baltimore*, 175 Md. 676, 3 A. 2d 747 (1939); *Bair v. City of Westminster, supra;* 26 Am.Jur.2d *Electricity, Gas and Steam* §§ 33, 36 (1966). Hence, where a municipality is expressly authorized to generate and sell electricity for private consumption, "there . . . [is] implied in the grant a duty to become equipped adequately to provide for not only the then existing demands, but also for any reasonably probable future growth or expansion in the demand of the consumers for the product supplied." *Public Service Comm'n v. Byron*, 153 Md. 464, 487, 138 A. 404, 413 (1927).

That municipal corporations possess implied power to purchase property outside their corporate limits whenever that power is necessary for the exercise of an express grant of power has been generally recognized. Thus, where municipalities have been expressly empowered to install sewers, to supply water, to operate electric plants, or to build streets, it has been held that they have implied power to purchase extraterritorial land in order to lay drainage

pipes, secure a water supply, construct electrical generating facilities, and purchase a quarry for road building material. *See, e.g., Southern Calif. Gas Co. v. City of Los Angeles,* 50 Cal. 2d 713, 329 P. 2d 289 (1958) (sewer works); *McBean v. City of Fresno,* 112 Cal. 159, 44 P. 358 (1896) (sewer works); *Hall v. Mayor and Council of Calhoun,* 140 Ga. 611, 79 S. E. 533 (1913) (water supply); *Miller v. City of Owensboro,* 343 S.W.2d 398 (Ky. 1961) (electric plant); *Freeman v. Trimble,* 21 N. D. 1, 129 N. W. 83 (1910) (drain outlet); *Schneider v. City of Menasha,* 118 Wis. 298, 95 N. W. 94 (1903) (quarry). *Cf. People ex rel. Sweitzer v. City of Chicago,* 363 Ill. 409, 2 N.E.2d 330 (1936) (power to establish nursery implied from express power to establish parks); *Borgelt v. City of Minneapolis,* 271 Minn. 249, 135 N.W.2d 438 (1965) (power to own and operate asphalt mixing plant implied from power to open, to pave and to maintain streets). *Contra Duncan v. City of Lynchburg,* 34 S. E. 964 (Va. 1900) (quarry). With respect to extraterritorial acquisition by municipal utilities, it is said in 12 E. McQuillin, *Municipal Corporations* § 35.17 (3rd ed. 1970):

> "Generally, a municipality may purchase or otherwise acquire property outside its limits, where necessary for use in connection with its utility plant, where the statute or charter so provides, either expressly or by implication. . . . And where a city requires outside electric current to supply itself and its inhabitants with light it may construct transmission beyond its boundaries to connect its plant with an outside plant."

The rule derives from the fact that land within the corporate limits of the municipality may not be suitable or sufficient for the exercise of express powers; thus, rather than limit the exercise of an express grant of power, the power to purchase extraterritorial property, if reasonably necessary for the exercise of an express power, is implied. *See* 56 Am.Jur.2d *Municipal Corporations* § 228 (1971).

In *Grinnell Co. v. City of Crisfield,* 264 Md. 552, 287 A. 2d 486 (1972), it was contended that a municipality having

express authority under a state statute to construct industrial buildings for the purpose of relieving unemployment had no power to erect a building outside its corporate limits. Although the municipality had no express power under its organic law to acquire extraterritorial property, we noted that the state statute imposed no "geographic limitation" on the location of a project by a municipality. In upholding the municipality's erection of the building beyond its corporate limits, we in effect applied the principle that a municipality if not prohibited by law may acquire property outside its corporate limits where such an acquisition is reasonably necessary to the exercise of powers expressly granted. To like effect, see *Wilson v. Board of Co. Comm'rs*, 273 Md. 30, 327 A. 2d 488 (1974), approving the use of public funds of a county in connection with pollution control measures installed upon facilities located in another county and in another state.

As heretofore indicated, the charter amendment in the present case authorizes the Town to own or finance any interest in real property for use in connection with any municipally owned public utility, within or without its corporate limits, including the power to acquire property interests in common with other privately owned public utilities for the purpose of securing entitlements to a portion of the product of the commonly owned facilities; or to contract with any such utility to operate the commonly owned system. The immediate purpose underlying the enactment of the amendment was manifestly to permit the Commission to secure additional generating capacity for its electric system by authorizing it to acquire an interest in Delmarva's Plant and thereby to obtain a guaranteed supply of electricity produced by nuclear energy for the benefit of its electric customers. That additional generating facilities are needed, and would benefit the Town, is conceded by the Birges. The Town maintains that in view of the chronic energy shortage, it is imperative that municipally owned electric utilities engage in cooperative agreements with other utilities so that what may be a crisis to one utility, such as peak load periods and failures of generating

equipment, may be successfully dealt with by a group of utilities acting together. The Town says that it has an obligation in the operation of its electric system to keep abreast of the progress and improvements of the age by turning to nuclear energy as a source of generating power rather than continuing to rely on fossil fuels in the face of shortages and rising fuel prices. Through purchase of an entitlement in Delmarva's Plant, the Town claims that it will obtain an interest in a nuclear facility which it could not acquire entirely on its own and that such acquisition would enable it to achieve economies of scale which it could not otherwise realize. The Town maintains that the course of action it has taken is essential to accomplish the objects and purposes underlying the grant of express power to it to operate an electric utility. To conclude otherwise, the Town says,

> ". . . would vitiate the [present] interconnection agreement which the Commission has with Delmarva tying Easton into the Pennsylvania Jersey Maryland Power Pool. A decision against the . . . [Town] would also have the effect of making illegal the ownership and use of all property of the Commission, including utility poles, wires and transformers, located outside the Town limits but within the service area assigned by the Public Service Commission of Maryland."

In view of the limited scope of the controversy before us, we consider the legality of the charter amendment only as it pertains to the Town's electric utility. We think it necessarily or fairly implied in or incident to the express power granted by the Legislature to the Town to operate an electric utility in a proprietary capacity that it may acquire extraterritorial property — including property lying in another state or property held in common with another privately owned electric utility — so long as it is reasonably essential to accomplish its mandated purposes. *See Sabaugh v. City of Dearborn*, 384 Mich. 510, 185 N.W.2d 363 (1971) (acquisition in Florida of Public Housing for elderly

residents of Dearborn); *Freeman v. Trimble, supra* (construction of drain outlet in Canada); *McLaughlin v. City of Chattanooga,* 180 Tenn. 638, 177 S.W.2d 823 (1944) (acquisition of land in adjoining state for airport); *Langdon v. City of Walla Walla,* 112 Wash. 446, 193 P. 1 (1920) (acquisition of land in neighboring state for a dam, reservoir and waterworks system); *Bernard v. City of Bluefield,* 117 W. Va. 556, 186 S. E. 298 (1936) (construction of sewage disposal plant in neighboring state).

Under § 3 of Article XI-E of the Constitution of Maryland (the Municipal Home Rule Amendment), the Town possesses the power and authority to amend its charter with respect to matters relating to its "incorporation, organization, government, or affairs." It is, of course, the general purpose of Article XI-E to permit municipalities to govern themselves in local matters. *Woelfel v. Mayor & Aldermen,* 209 Md. 314, 121 A. 2d 235 (1956). We noted in *Hitchins v. City of Cumberland,* 208 Md. 134, 117 A. 2d 854 (1955), that Article XI-E is generally in accord with the recommendations of the Commission on Governmental Organization of the State (the so-called Sobeloff Commission); the report of that Commission stated that final determination of what constitutes a matter of purely local or municipal concern, *i.e.,* a matter relating to the "incorporation, organization, government, or affairs" of the municipality, is for the courts to make in light of all existing circumstances. In determining whether a matter is local or is one of general state concern, 1 C. Antieau, *Municipal Corporation Law* § 3.36 (1973) states:

> "If the effect of local rules or municipal control is not great upon people outside the home-rule city, the matter is apt to be deemed local. . . .
>
> "Contrariwise, if the effect of the regulation or the administration of a particular matter is likely to be felt by a considerable number of people outside the city and in a rather strong degree, courts are probably going to conclude that the concern is for the state."

Considering the nature and needs of the Town's electric utility, its limited service area, its overall regulation by the State through the PSC,[1] and the negligible effect upon nonresidents of the Town, we think the power granted by the charter amendment with respect to the Town's electric system is in the sense contemplated by Article XI-E a local matter involving the "incorporation, organization, government, or affairs" of the municipality.

> *Decree of the Circuit Court for Talbot County approving Charter Amendment Resolution No. 40 modified to apply solely to the town's electric utility, and, as modified, affirmed in all respects; costs to be paid by appellants.*

---

1. The Public Service Commission law, Code (1975 Repl. Vol.) Art. 78, § 2 (f), (o) provides that "every municipal corporation in the business of supplying electricity for other than municipal purposes" is an electric company, and a public service company, under the jurisdiction of the PSC. Furthermore, Art. 78, § 53 provides: "No municipality except the Mayor and City Council of Baltimore shall build, maintain or operate for other than municipal purposes any plant for supplying any gas or electricity, without a certificate of authority from the Commission. . . ."