Dear Honorable C. Eugene Butler Mayor,
You have asked for our opinion whether the Easton Utilities Commission ("Commission"), an agency of the Town of Easton ("Town"), may provide certain telecommunications services beyond the corporate limits of the Town. Specifically, you asked whether the Commission, which is authorized by the Town charter to provide cable communications services, may extend those services throughout Talbot County, pursuant to a non-exclusive franchise awarded by the County. Your request was accompanied by the opinion of the Town attorney, who concluded that it may.
In our opinion, the municipal charter may authorize the Commission to provide telecommunications services to Town residents. The Commission may extend those services beyond the Town's corporate limits, as long as extraterritorial services are ancillary to municipal services and do not adversely affect the services provided to municipal subscribers or compromise the public purpose justifying the provision of telecommunications services.
Subject to those conditions, the Commission may extend service throughout Talbot County.
 I Background
A. Easton Utilities Commission
1. Creation of Commission
In 1914, the General Assembly first authorized the Town of Easton to operate an electric system and to supply light, heat, and power to "the citizens of Easton and vicinity".
See Chapter 143, Laws of Maryland 1914 (emphasis added). At the same time, the Legislature created the Commission as an agency of the Town, investing it with "broad powers to manage and operate `the municipal sewerage system and water works and all or any other revenue producing utilities which are now owned or may be hereafter constructed or acquired . . . ." Chapter 263, Laws of Maryland 1914 (emphasis added). See also Birge v. Town of Easton, 274 Md. 635, 636-37, 337 A.2d 435 (1975).
Two years later, the General Assembly expanded the Commission's authority to undertake certain enterprise functions. "[T]o increase the revenues of the municipal power plant . . . and to that end to encourage . . . greater use of electric motors and household appliances," among other activities, the Legislature authorized the Commission to install electric wiring and fixtures in the Town "and vicinity" and to buy and sell electric materials and fixtures. See Chapter 302, Laws of Maryland 1916.
The provisions governing the Commission were later codified primarily in Article IV of the Easton Town Charter. See 3 Municipal Charters of Maryland, ch. 46.
2. Authorization to Provide Cable Communications Services
Amendments to the municipal charter expanded the Commission's authority to include providing telecommunications services.[1] In particular, a 1970 charter amendment authorized the Commission to provide cable television service, although it would be 14 years before this service was actually available.[2] In 1998, the charter was amended to authorize the Commission to offer "cable communications systems," a term understood to include both a cable television system and Internet service. See Easton Resolution No. 5615 (effective June 13, 1998).
3. Current Charter Provisions
The current charter includes a broad grant of general authority to the Town Council:
 The council shall have the power to pass all such ordinances not contrary to the Constitution and laws of the state of
 Maryland or this Charter as it may deem necessary for the good government of the town; for the protection and preservation of peace and good order; for securing persons and property from violence, danger, or destruction; and for the protection and promotion of the health, safety, comfort, convenience, welfare, and happiness of the residents and employees of the town and visitors thereto and sojourners therein.
Easton Charter, Article II, § 16.
The charter also includes a specific grant of authority to the Commission in connection with utility services:
In addition to such other powers and duties as this Charter or the council may provide, the powers and duties of the Commission shall be as follows:
 (a) The Commission shall operate, manage and maintain the municipal sewerage, water, electric, gas, cable communications system, including a cable television system, and all or any other revenue producing utilities which are now owned or may be hereafter constructed or acquired by the Town. . . .
Easton Charter, Article IV, § 2(a).
B. Expansion of Services Beyond the Town Limits
In 1984, the Commission began offering cable television service to Easton residents.
That same year, in response to requests for cable service from individuals living outside the Town, the Talbot County Council awarded the Commission a non-exclusive franchise to provide cable television service in an area approximately coterminous with its electric service territory.[3] The Commission then extended its cable service beyond the Town's corporate limits. In 2001, the Talbot County Council expanded the Commission's cable franchise to include all of the unincorporated areas of Talbot County.[4]
As part of its cable television service, the Commission maintains a community bulletin board channel and public access channel. It established and financially supports Mid-Shore Community Television, Inc., a nonprofit, independent corporation that provides coverage of Town Council and Talbot County Council meetings, candidates' fora, and other public events of interest within and beyond the Town's borders.
In 1998, the Commission launched "Easton Online," an Internet service provider.
That service currently provides Internet access to approximately 6,200 customers, through the Commission's cable network and dial-up access.[5]
While most of those customers are in Talbot County, the availability of local exchange numbers allows some customers in surrounding counties to subscribe to the Commission's dial-up Internet access without incurring long-distance rates.
The Commission also provides other communications and television services that extend beyond the Town limits. It has designed and constructed a optical fiber network for Shore Health System, Inc., linking Memorial Hospital and seven satellite facilities in Easton, and is in the process of installing a wireless data link between Memorial Hospital and Dorchester General Hospital in Cambridge. The Commission provides wireless data services among various Talbot County government offices within or near Easton. We understand that it is exploring the possibility of linking County offices, schools, emergency service providers, and similar entities by fiber optic cable.[6]
We understand that the Commission has received a request from another municipal corporation in Talbot County to provide cable services to that town's residents. This request apparently prompted your inquiry concerning the Commission's authority to provide services beyond Easton's boundaries.
 II Analysis
The Commission's authority to offer cable communications services derives from the municipal charter. Because a municipal corporation cannot accomplish through an agent what it cannot accomplish directly, your inquiry requires an evaluation of the authority of the Town of Easton itself. See, e.g., 80 Opinions of the Attorney General 227 (1995) (powers of revenue authority established through municipal charter amendment depends on scope of relevant statutory grant to municipality); 2A McQuillin, The Law of Municipal Corporations § 10.09. Stated otherwise, the Town could not authorize the Commission to undertake any action that the Town itself could not undertake.
To evaluate the Town's authority, we consider first whether a Town charter may authorize the Town to offer Internet and cable services to Town residents. We consider whether such an undertaking has a public purpose, and if so, can be authorized under the Town's home rule authority. Then we consider the extension of services beyond the municipal limits.
A. Proprietary Services and the Public Purpose Requirement
A municipality does not necessarily act beyond its legal authority when it engages in a proprietary enterprise, such as providing communications services that might otherwise be provided by the private sector.[7]
However, even when a municipal corporation is engaged in a proprietary function, it must have a public purpose. Mayor and City Council of Cumberland v. Powles, 255 Md. 574, 579, 258 A.2d 410 (1969); see also 56 Am. Jur.2d Municipal Corporations § 178.
The concept of "public purpose" is not a matter of exact definition. As the Court of Appeals has indicated, "the methods by which a public purpose is served change with the times; in the world of today, services are often more important than edifices." Lerch v. Maryland Port Authority, 240 Md. 438, 449, 214 A.2d 761 (1965). An analogy is frequently drawn between the provision of Internet services today and the provision of electricity in the early 20th century. See, e.g., Carlson, AHistorical, Economic, and Legal Analysis of Municipal Ownership of theInformation Highway, 25 Rutgers Computer Tech. L.J. 1, 23-27 (1999). In earlier times, justifications for municipal provision of electric service included ensuring the availability of the service, dissatisfaction with private providers, economic benefits to the municipality from the availability of the service, and quality of life factors. Id. These justifications, considered to serve public purposes with respect to electric service, may reasonably be extended to Internet access and cable television services today. In our view, there can be little question that provision of Internet and cable communications services by a municipal government to residents of the municipality constitutes a valid public purpose.
B. Municipal Home Rule
Even if a particular municipal action serves a public purpose, there remains the question whether the action is within the Town's legal authority. A municipal corporation, such as Easton, derives its authority from two distinct sources: (1) public general law enacted by the General Assembly, and (2) its municipal charter as amended in accordance with Article XI-E of the Constitution, known as the municipal home rule amendment.[8] 88 Opinions of the Attorney General ___ [Opinion No. 03-008 (March 31, 2003)], slip op. at 7.
No public general law authorizes a municipal corporation to provide cable communications and Internet services.[9] Thus, we must look to the Town's authority under the municipal home rule amendment.
Subject to limited exceptions not relevant here, the municipal home rule amendment authorizes a municipal corporation to amend its charter "relating to the incorporation, organization, government, or affairs of [the] municipal corporation." Article XI-E, § 3, Maryland Constitution.[10] In developing the municipal home rule amendment, the drafters intentionally declined to address the scope of this authority. See Commission on Administrative Organization of the State, Second Report: Local Legislation in Maryland, p. 32 (1952) ("Sobeloff Commission Report"). Instead, defining the parameters of a municipal corporation's authority under Article XI-E was left to the courts. Id.
The Court of Appeals has treated the municipal home rule amendment as "a general grant to legislate with respect to `matters of local concern.'" 62 Opinions of the Attorney General 275, 293 (1977); see Inlet Associates v. Assateague House Condominium Association, 313 Md. 413,425, 545 A.2d 1296 (1988).[11] Like the concept of "public purpose," what constitutes a "local matter" changes with the times. As the Sobeloff Commission explained, "matters considered solely as local in nature must be reviewed as circumstances change. . . . To ensure flexibility it seems preferable not to include a list of local powers in the Constitution." Sobeloff Commission Report at p. 32. In Birge, the Court approved the following standard for determining whether a matter is one of local or of State concern:
 If the effect of local rules or municipal control is not great upon people outside the home-rule city, the matter is apt to be deemed local. . . . Contrariwise, if the effect of the regulation or the administration of a particular matter is likely to be felt by a considerable number of people outside the city and in a rather strong degree, courts are probably going to conclude that the concern is for the state.
274 Md. at 644, citing 1 C. Antieau, Municipal Corporation Law § 3.36.
As with many proprietary services that a municipal government might offer, a municipality's decision to provide its residents with an efficient means of communication is a matter of local concern relating to the affairs of the municipal corporation. In our view, the Town charter may authorize the Town to offer Internet access and cable television services to municipal residents through a municipal agency such as the Commission.[12]
C. Extraterritorial Services
If a municipal corporation exercises its authority to provide cable communications and Internet services to its residents, there appears to be no reason these services cannot be extended beyond the corporate boundaries of the municipality, as long as the extension does not compromise the primary goal of service to municipal residents or the public purpose that underlies the municipality's provision of the services.
An obvious analogy is the extension of traditional municipal utility services beyond the corporate limits of the municipal corporation. The Commission's early extension of electricity to regions well beyond Easton's corporate limits pursuant to a legislative authorization to serve Easton "and vicinity" is illustrative of the common practice under which municipal electric companies provided service to outlying areas that private utilities were not serving. Similarly, in recent years, municipal utilities have extended water service and sewer systems to customers outside the municipal limits.
In a number of cases, Maryland appellate courts have considered the circumstances under which a municipal corporation might be required to provide services outside the town.
See, e.g., Spring v. Bradley, 355 Md. 79, 733 A.2d 1038 (1999). The authority of a municipal corporation in Maryland to voluntarily provide extraterritorial services does not appear to have been questioned. In at least two cases, the Court of Appeals has recognized that the general power of a municipality to own and operate a utility includes the power to serve customers beyond the corporate limits. Birge v. Town of Easton, supra; Bair v. Mayor and City Council of Westminster, 243 Md. 494, 498,221 A.2d 643 (1966).
Such authority is likely limited by the principle that "extraterritorial supply may not be so extensive as to impair the local supply or the efficiency of the system." Sands Libonati, Local Government Law § 18.06. In addition, if extraterritorial service became so extensive that it dwarfed service to municipal residents, it might be difficult to characterize the service as a "local" matter authorized under the home rule amendment. In other words, a municipal corporation may voluntarily provide extraterritorial services if those services are ancillary to, and do not adversely affect, services to municipal residents.
A municipality's ventures beyond its boundaries may promote the public purpose that justifies its proprietary activity. See, e.g., Wilson v. Bd. of County Comm'rs of Allegany County, 273 Md. 30, 327 A.2d 488 (1974) (upholding county's issuance of industrial revenue bonds in connection with paper mill pollution abatement efforts, including projects beyond county limits as those projects would facilitate cleaner environment in county); Grinnell Co. v. City of Crisfield, 264 Md. 552, 287 A.2d 486
(1972) (municipal corporation's financing of private business enterprise outside corporate limits not inconsistent with public purpose requirement as municipal residents would seek jobs throughout region). For example, the availability of broadband Internet access through the Commission's cable network may reduce the cost of this service to Town residents[13] and contribute to the economic development of the region, with concomitant benefits to Easton residents.[14]
Thus, as long as the provision of extraterritorial services does not have a detrimental effect on services to municipal subscribers or otherwise compromise the public purpose underlying the provision of services, the Town may authorize the Commission to provide cable communications and Internet services throughout Talbot County.[15]
 III Conclusion
In our opinion, the Easton Charter may authorize the Commission to provide cable communications services and Internet access to Town residents. The Commission may extend those services beyond the Town's corporate limits, as long as extraterritorial services are ancillary to municipal services and do not adversely affect the service provided to municipal subscribers or compromise the public purpose underlying the provision of the services. Subject to those conditions, the Commission may extend service throughout Talbot County.
J. Joseph Curran, Jr. Attorney General
William R. Varga Assistant Attorney General Robert N. McDonald Chief Counsel Opinions and Advice
[1] Amendments to the charter are adopted pursuant to Easton's municipal home rule authority. Article XI-E, §§ 3 and 4; see also Annotated Code of Maryland, Article 23A, § 11-18.
[2] In 1974, the charter was amended to permit the Town to acquire "any interest in real or personal property for use as part of or in connection with any municipally owned public utility, within or without its corporate limits or any designated service area, including, but not by way of limitation, an interest in any gas or electric plant." Easton Charter, Article II, § 20. In Birge, the Court of Appeals held that this provision was a valid exercise of the Town's home rule authority and upheld the Town's authority to acquire a minority interest in a proposed out-of-state nuclear power facility to serve the needs of a 50 square-mile service area both within and beyond the Town's corporate limits. However, in evaluating the Town's authority, the Court made clear that its decision was limited to the Commission's electric utility function. 274 Md. at 643.
[3] Talbot County has adopted charter home rule under Article XI-A of the State Constitution and thus has authority to award a franchise under the Express Powers Act. See Annotated Code of Maryland, Article 25A, § 5(B). See also Talbot County Code, Chapter 34 — Cable Television and Communications Systems.
[4] On January 23, 2001, the Talbot County Council enacted Bill No. 803, granting the Commission a non-exclusive franchise to construct and operate a cable communications system within the unincorporated areas of the County through May 29, 2006, subject to execution of a franchise agreement. A franchise agreement was executed in February, 2001.
[5] Because dial-up access is provided through telephone lines rather than the Commission's cable service, the franchise awarded to the Commission by Talbot County would not appear to apply. See, e.g., Bell Atlantic-Maryland, Inc. v. Prince George's County, Maryland,49 F. Supp.2d 805, 819-20 (D.Md. 1999), vacated on other grounds,212 F.3d 863 (4th Cir. 2000).
[6] While the reach of the Commission's activities may be unique in Maryland, municipal entry into the telecommunications marketplace is not uncommon in other states. One commentator reported that, as of January 2001, there were 109 municipally-owned cable systems and 61 municipalities offered Internet services. Note, Municipal Entry Into the Broadband Cable Market: Recognizing the Inequities Inherent in Allowing Publicly Owned Cable Systems to Compete Directly Against Private Providers, 95 Nw. U. L.Rev. 1099, 1108 (2001).
[7] The distinction between governmental and proprietary functions, developed primarily in connection with questions of municipal immunity, has been criticized by the Court of Appeals as "at times, illusory" and "not altogether logical." Thomas v. Bd. of County Comm'rs of Prince George's County, 200 Md. 554, 559, 92 A.2d 452 (1952). However, it has never been abandoned and there seems little question that provision of services such as Internet access and cable television would fall in the proprietary category, particularly when services are provided beyond the municipal limits.
[8] While the franchise awarded by Talbot County provides the necessary authority for the Commission to access County rights-of-way, it cannot serve as authority for the Town to engage in the business of offering extraterritorial services.
[9] Public general law does grant a municipal governing body authority to impose fees in connection with municipal enterprises. Article 23A, § 2(b)(33) (granting a municipal legislative body the authority "to establish and collect reasonable fees and charges . . . [a]ssociated with the exercise of any governmental or proprietary function authorized by law to be exercised by the municipal corporation") (emphasis supplied). However, the enterprise itself must be supported by other legal authority.
[10] The Constitutional provision reads: (continued. . .) drawn between the provision of Internet services today and the provision of electricity in the early 20th century. See, e.g., Carlson, A Historical, Economic, and Legal Analysis of Municipal Ownership of the Information Highway, 25 Rutgers Computer Tech. L.J. 1, 23-27 (1999). In earlier times, justifications for municipal provision of electric service included ensuring the availability of the service, dissatisfaction with private providers, economic benefits to the municipality from the availability of the service, and quality of life factors. Any such municipal corporation, now existing or hereafter created, shall have the power and authority, (a) to amend or repeal an existing charter or local laws relating to the incorporation, organization, government, or affairs of said municipal corporation heretofore enacted by the General Assembly of Maryland, and (b) to adopt a new charter, and to amend or repeal any charter adopted under the provisions of this Article.
[11] Of course, the municipal home rule amendment did not grant municipal governments absolute autonomy. Town of New Market v. Milrey, Inc., 90 Md. App. 528, 538, 602 A.2d 201 (1992) ("Municipalities are creatures of the State"). Maryland courts have often expressed the limitation on municipal powers in a formulation known as Dillon's Rule:
 [A] municipal corporation . . . can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the [municipal] corporation, — not simply convenient, but indispensable.
Hardy v. Housing Management Company, 293 Md. 394, 396-97, 444 A.2d 457, cert. denied, 459 U.S. 989 (1982), citing 1 J. Dillon, Municipal Corporations § 237 (5th ed. 1911) (emphasis in decision).
[12] In our view, the preemption provision of the federal Telecommunications Act of 1996 does not affect the answer to your question. In an effort to open telecommunications markets to competition, that statute expressly preempted state and local regulation that "may prohibit or have the effect of prohibiting the ability of any entity" to provide telecommunications services, unless the regulation falls within either of the Act's "safe harbor" provisions. See47 U.S.C. § 253(a)-(c).
Courts have reached conflicting results as to whether the reference in the federal statute to "any entity" includes a municipality. Compare, e.g., City of Bristol v. Earley, 145 F. Supp.2d 741 (W.D.Va. 2001) (Act preempted state statute prohibiting city from providing fiber optic telecommunications services to public) with City of Abilene v. FCC,164 F.3d 49 (D.C. Cir. 1999) (Act did not preempt state law prohibiting municipalities from providing telecommunications service). None of these cases has suggested that the federal Act was intended to affect a municipality's home rule powers under a state constitution.
While, in accordance with our customary practice, we defer to the Town attorney on the construction of local law, we note that the Town charter includes a provision that appears to restrict competing services. Easton Charter, Article II, § 20(c). It may be advisable for the Town to review this provision in light of the federal Act.
[13] You advise that the extension of services beyond the Easton town limits has in fact worked to municipal subscribers' advantage, in part by spreading costs among a larger customer base.
[14] Of course, a municipal corporation may not undertake a proprietary enterprise solely to obtain income or derive profit. See, e.g., 56 Am Jur 2d Municipal Corporations, § 193. You have not inquired about, and we do not address, the issue of cross-subsidization of regulated and unregulated services offered by the Commission.
[15] Indeed, the permissible reach of extraterritorial telecommunications services may extend to the "vicinity" of Easton beyond Talbot County. To the extent that there is uncertainty as to the permissible reach of these services, the General Assembly could resolve that uncertainty by enacting a public general law expressly defining the geographic limits to which municipal services might be extended. *Page 115